## Case No. 5,572.

GOODYEAR et al. v. HONSINGER.

[2 Biss. 1; 3 Fish. Pat. Cas. 147.] [1]

Circuit Court, N. D. Illinois. March Term, 1867.

PATENTS—PRIOR ADJUDICATION — DIVIDING PATENT — INJUNCTION NOT ALWAYS GRANTED ON VALID PATENT — EFFECT OF ACTS OF ORIGINAL PATENTEE—SHOULD ASSERT HIS RIGHTS.

1. When there has been a prior adjudication in another court, in which the validity of a patent has been fully contested and sustained, the court will, upon a motion for a preliminary injunction, consider the validity of the patent as prima facie established.

2. Whether a patent for a process can be reissued and divided into two patents, one for the process, and the other for the product produced by the process, quaere.

3. It is always unfair to those who are licensed to use the particular article or method, under letters patent, to allow, by laches, others to use what the licensees alone have a right to use under their licenses.

4. A court of equity, while it may be satisfied the patent is valid, does not feel inclined, where those claiming under the patent have been negligent in enforcing their rights, to interfere in all cases, by an absolute peremptory injunction.

5. Those who hold under an extension, are to be visited with the consequences of the acts of the owners of the original patent. They take the extension as it falls to them on the expiration of the patent, and are not to be reinstated in all the rights of the original patentee.

6. Where a patentee has stood by for a series of years, and permitted, or not formally objected to the use of the article claimed under the letters patent, such conduct ought to be visited to some extent upon him. Courts of equity ought to demand of patentees reasonable diligence in asserting their rights.

In equity. This was a motion for a provisional injunction, to restrain defendant from infringing letters patent [No. 8,075] for an "improvement in the manufacture of India rubber," granted to Nelson Goodyear May 6, 1851, re-issued to Henry B. Goodyear, administrator of Nelson Goodyear, deceased, May 18, 1858, in two divisions [Nos. 556 and 557], and extended to Henry B. Goodyear, for seven years from May 6, 1865. On July 17, 1866, so much of the invention as applied to dental purposes was assigned to Samuel A. Duncan.

The claims of the original patent were as follows: "What I do claim, etc., is the combining of India rubber and sulphur, with or without shellac, for making a hard and inflexible substance hitherto unknown, substantially as herein set forth. I also claim the combining of India rubber, sulphur, and magnesia or lime, or a carbonate or a sulphate of magnesia or of lime, either with or without shellac, for making a hard and inflexible substance hitherto unknown, substantially as herein set forth."

The disclaimer and claim of re-issue 556

1 [Reported by Josiah H. Bissell, Esq.; reprinted in 3 Fish. Pat. Cas. 147; and here republished by permission.]

was as follows: "It is well known that it has been proposed to produce a hard substance from caoutchouc, by passing it through highly heated liquid sulphur, but this has not been attended with practical success. I do not wish to be understood, however, as making claim broadly to the union of caoutchouc and sulphur in the proportions named, however these substances may be united and treated. But what I do claim as the invention of the said Nelson Goodyear, and desire to secure by letters patent, is the combining of sulphur and India rubber, or other vulcanizable gum, in proportions substantially as specified, according to the vulcanizing process of Charles Goodyear, for the purpose of producing a substance or manufacture possessing the properties or qualities substantially as described; and this I claim, whether the said compound of sulphur and gum be or be not mixed with other ingredients, as set forth.'

The disclaimer and claim of re-issue 557 was as follows: "I do not wish to be understood as making claim broadly to a manufacture or substance produced by the admixture of caoutchouc and sulphur, nor as making claim broadly to a manufacture or substance by subjecting the compound of caoutchouc and sulphur, whether with or without other substances, to a high degree of heat, as, prior to the invention of Nelson Goodyear, caoutchouc and sulphur had been compounded, and such compound alone, as well as other ingredients, had been subjected to a high degree of heat, but not to produce the manufacture or substance having the character peculiar to the said manufacture or substance invented by the said Nelson Goodyear. What is claimed, etc., is the new manufacture or substance herein above described, and possessing the substantial properties herein described, and composed of India rubber, or other vulcanizable gum, and sulphur, in the proportions substantially as described, and when incorporated, subjected to a high degree of heat, as set forth, and this I claim, whether other ingredients be or be not used in the preparation of the said manufacture, as herein described."

A. Pollock, S. A. Goodwin, and F. H. B. Latrobe, for complainants.

S. S. Fisher, for defendant.

DRUMMOND, District Judge. In 1844 Charles Goodyear obtained a patent from the United States for a new product, which he claimed he had made by combining caoutchouc with sulphur in certain proportions, which letters patent were surrendered in 1849, and a re-issue was made by the government upon the original letters patent. The product thus described by Charles Goodyear in his letters patent and re-issue, was, as is well known, somewhat pliable in its character, not hard or stiff. In 1851 Nelson Goodyear claimed that he had made an improvement upon the invention of Charles Goodyear, and letters patent were issued to him on the 6th of May.

The discovery which he claimed he had made was, that by combining in certain proportions sulphur and caoutchouc, a hard substance was produced, somewhat in the nature of horn or ivory, susceptible of a polish. This was called hard rubber, or, in consequence of the heat that was applied to it, "a high degree of artificial heat," as he terms it in his specifications, vulcanite. Nelson Goodyear died July 10, 1852; and it being claimed by his representatives that there was an error or mistake in the letters patent and the specifications as they were issued in May, 1851, application was made for a re-issue, and accordingly, on May 18, 1858, a re-issue was made to the administrator of Nelson Goodyear, consisting of two patents, numbered 556 and 557. These patents were issued, the one for the "method," as it is called, of producing the result claimed by Nelson Goodyear in his letters patent and specifications of May, 1851; the other was for the product. The patent would run, (the re-issue, as a matter of course, claiming nothing more than was claimed in the original patent,) from 1851 to 1865.

The patent then expiring, application was made under the law in force to the commissioner of patents for the extension of the patent, and accordingly, May 6, 1865, an extension was granted to the administrator of Nelson Goodyear, who thus becomes a party to this suit; and on July 17, 1866, an assignment was made to Samuel A. Duncan of the right under the patent and re-issue, so far as the invention was to be applied to dental uses. The two complainants now file their bill against Dr. Honsinger, a dentist of this city, claiming that he has violated the invention secured by the original letters patent, re-issue and extension.

I stated, during the progress of the argument, that on this motion I should consider it as prima facie established that the patent was valid. In 1862 a decree was rendered by Mr. Justice Nelson, Judge Smalley, of the district court, sitting with him, upon this extension and re-issue granted in 1858. That suit was very closely contested, and the patents thoroughly considered by the court; and a decree was rendered, establishing the validity of the patents, and of the rights under the re-issue.

The only criticism I feel inclined to make upon the re-issue in 1858 is as to the manner in which it was made—consisting of two letters patent, and two distinct specifications and claims—one for the "method" by which the product is obtained, and the other for the product itself. It has occurred to me as a question, whether the two things claimed are not essentially the same in their nature. The invention was a certain product, obtained in a particular way; and the claim, as set forth in one of the specifications, is "the combining of sulphur and India rubber, or other vulcan-

izable gum, in proportions substantially as specified, when the same is subjected to a high degree of heat, substantially as specified, according to the vulcanizing process of Charles Goodyear, for the purpose of producing a substance or manufacture possessing the properties and qualities substantially as described, and this, whether the compound of sulphur or gum be or be not mixed with other ingredients, as set forth;" in the other —where the mere product is claimed—the claim is set forth in this language: "The new manufacture or substance herein above described, and possessing the substantial properties described, and composed of India rubber or other vulcanizable gum and sulphur in the proportions substantially such as described, and, when incorporated, subjected to a high degree of heat, as set forth, and this whether other ingredients be or be not used in the preparation of the said manufacture herein described."

Now I am inclined to think that the patent is only valid for the particular method described, by which the result is produced. The product, obtained in the manner described, is the invention, and for that letters patent might issue—whether or not this product by possibility could be produced by the compounding of other materials, is a question that it is not necessary to discuss at this time. I shall consider the letters patent as valid, Judge Nelson and Judge Smalley having adjudicated upon their validity.

Then, as to the infringement by the defendant;—it is true that some affidavits have been filed by him, one particularly, in which he claimed that he did not admit to a witness, whose affidavit is on file, that he had violated the patents of the plaintiffs. But I do not understand him to deny that he has used for dental purposes, the product which the complainants claim, in the manner set forth under the letters patent.

I understand that it is stated in the specifications that there may be certain coloring matter introduced into the material from which hard rubber or vulcanite is to be created, and so whatever either experience or skill might suggest in relation to that coloring matter, could be added; and as the idea is distinctly set forth in the specifications, it could be easily varied by any one according to his fancy. The leading idea is there, and if some other coloring matter is used, which is not specifically set forth in the letters patent, I think that would not affect the validity of the patents themselves. Therefore I also take it for granted under the affidavits, that the defendant has used what is claimed under the letters patent, and so has infringed.

The only difficulty I have had in the examination of the case, and which I may say I had during the progress of the argument, was and is in consequence of what has taken place since the re-issue in 1858. What are the facts in relation to that? The American Hard Rubber Company became possessed of the rights, the original patent and re-issue, so long as they might exist under the original patents, that is to say, until 1865. Under these rights they manufactured the hard rubber or vulcanite. They also prepared what is called "a plastic compound" which could be vulcanized at the will of the dentist, or of any one else who understood the mode of creating vulcanite. It was colored, and prepared in every respect for the dentists, and all they had to do was simply to apply the artificial heat to make it vulcanite, or hard rubber—such a material as to enable them to use it for their special purpose—a plate for artificial teeth or otherwise.

There is no doubt that the claim to this product, vulcanite, was always set up by the representatives of Nelson Goodyear, and that they denied the right of the dentists to use it for their special purpose, without the consent of the patentee, or his representatives. This claim was set forth by publication, by application to the dentists to obtain licenses, and in other forms. It, however, was not acquiesced in by the dental profession. The affidavits filed in this case show that in 1855, possibly in 1854, this material first began to be applied to dental purposes, and in three or four years it came into general use, both by those who had licenses and those who had not. The American Hard Rubber Company about this time, began to manufacture this plastic compound, colored, for the special use of the dentists, and it was sold by their agents from that time until the expiration of the patent.

It is set forth in the bill (and such is the statement of Ropes in his affidavit) that in all instances this preparation thus made by the American Hard Rubber Company, was labelled in a way to indicate to the public that it could be used and manufactured into vulcanite by those dentists only who had licenses under the patent; and if the case had stood here, alone, unaffected by anything that occurred afterward, I should have reached a different conclusion on the application, from that at which I have arrived from other facts in the case, to which I will now advert.

Notwithstanding the issuing of the licenses under the patent to the number of two thousand, as is said in the bill, and the manufacture of this plastic compound by the American Hard Rubber Company, with the labels on the parcels thus manufactured, it is undoubtedly true that a large number of the dentists of the United States declined to accept such licenses, or pay for them under the patent. It is also true, that, notwithstanding the prohibition contained upon the label of the article as manufactured, the agents of the American Hard Rubber Company did knowingly sell it to dentists who had no licenses. The reason why this was permitted, and the way in which the effect of those sales is sought to be avoided, is thus set forth in the bill: "The great expense of prosecuting infringements in the different parts of the Unit-

ed States, in some of which the recovery would not equal the unavoidable expenses of the suits not taxable as costs, and the near approach of the expiration of the term for which said letters patent were originally granted, at which time the operations of the said American Hard Rubber Company in the West would cease by limitation, deterred the American Hard Rubber Company, who were to bear the whole expense of the litigation, from prosecuting any more suits."

It was unfair, and is always unfair, to those who are licensed to use the particular article or method, under letters patent, to allow others to use what the licensees have thus purchased. It is true that this conduct may be explained. There may be circumstances such as would not warrant any inference against the patentee, from such conduct; as, for instance, if the patentee were unable to prosecute the parties thus infringing the patents; or, if circumstances were such as to indicate that there was no acquiescence, expressed or implied, in the violation; or, as appears in this case, that there was a suit pending in one of the circuit courts of the United States, where the right under the patent was to be tested: That would constitute a reason why the patentee, or those claiming under him, should not involve themselves in great expense while there might be a question as to the validity of the patent. So far as it goes, that is a sufficient justification for the parties claiming under this patent. But it does not go the full extent to which I think the patentee ought to go when he comes into court and asks for the summary remedy of injunction, without qualification, and without condition. I am constrained to believe that in this case the representatives of the patentee had the ability to prosecute those who infringed their rights under the patent, and that it was, to some extent, a voluntary acquiescence in a fact which was notorious, and which the affidavits show must have been known to the patentees or their representatives—that this article was sold in the market —was being purchased by dentists from time to time for a series of years, and was being used by them for their own special purposes. Under such circumstances, a court of equity, while it may be satisfied that the patent is valid, does not feel inclined, to interfere, in all cases, by an absolute peremptory injunction, without condition or qualification.

I take it that these complainants, although they claim under the extension, are to be visited with the consequences of the acts of their predecessors, the American Hard Rubber Company. They take the extension just as it fell to them on the expiration of the patent from the successors of those claiming under the original patent and the re-issue, and, of course, are not to be reinstated in all the original rights of the patentees, in every respect, as they stood when the original letters patent were issued, or the re-issues were given.

But, as I said during the argument, I desire to protect the rights of all the parties; I shall, therefore, in this case make a special order. I am satisfied of the validity of the letters patent and the re-issues, and have no doubt that the defendant has infringed. I shall accordingly issue an injunction against the defendant, with leave to him, at a future time, to come in and have the injunction dissolved, upon giving adequate security to the complainants.

It has been said that, to some extent, the granting such an order as this, on such a condition, is to deprive the complainants of their rights under the letters patent; that there is nothing so potent as a peremptory writ of injunction, without qualification or condition. There can be no doubt of that. It suspends at once, so far as the mandate of the court can do it, all acts of use under the letters patent, by any one, except with the consent of the patentee or his representatives. But when the patentee has stood by for a series of years, and permitted, or not objected in the way in which the law authorizes him to object, to the use of the article claimed under the letters patent, I think that such conduct ought to be visited, to some extent, upon the patentee.

The unconditional injunction of the court places the dentists in the power of the patentees. A conditional injunction of the court, allowing it to be dissolved on giving security, it may be said, places the patentee in the power of the dentists; and yet, to some extent, the same consequences follow—for example, an absolute, unconditional injunction can only operate in terrorem over other parties using the article without the consent of the patentee, by compelling them to take out licenses. After injunction is granted unconditionally, the patentee can go to all who use the vulcanite, and say to them: "You must take out a license, or I will file a bill and have an injunction issued against you, as I have already against your brother dentist." But so it is in the other case. The patentee can go to the dentists who use this article without permission, and say to them: "I will file a bill against you, and will compel you to give security, as I have already compelled your brother dentist."

I admit that the one aspect of the case is more potential for the rights of the patentee, than the other. But from what I have already said, it will be seen that I visit, to some extent, upon the patentee the consequences of his own laches. This was the view I took, a short time since, on full consideration of a case growing out of a patent to parts of a sewing machine. I think that courts of equity ought to demand of patentees reasonable diligence in asserting their rights. Of course, the rule is flexible, subject to be changed by the peculiar circumstances of each case. A court of equity should always act fairly and justly, so as to protect the rights of patentees, although they may not, owing to various circumstances, prosecute their rights so soon or so early as,

under other circumstances, they ought to do.

Now I take this course, for this reason. The view that I take of the rights of the complainants and the defendant will be understood on both sides. There is a litigation now pending, in which the rights of the patentee will be fully ascertained. The only change, as asserted by the present litigation, from what was claimed in the former—the one terminated in 1862, by Judge Nelson and Judge Smalley—is, I suppose, in the application of this particular material to dental purposes. As I understand, that question was not distinctly in issue in that case.

I shall give the complainants a peremptory writ of injunction now, allowing the defendant to move to dissolve it at a future time to induce the other dentists, who are not parties to this suit to make some satisfactory arrangements with the patentees. I should feel very much inclined, if the dentists should prove recusant, refractory, or unreasonable, to grant hereafter, on application, a peremptory writ of injunction, without condition or qualification. What I want to do is to protect the rights of the complainants and the rights of the defendant and of the public.

The order of the court will be, that the injunction issue against the defendant, with leave to him, within ten days, to come in, and, on notice, move to dissolve the injunction upon giving adequate security to the complainants. I do not want to compel these dentists actually to pay anything now to these patentees for licenses, but to give adequate security to do so. If the patentees are not willing to take the personal obligation of the dentists, I want them to be compelled to give security satisfactory to the parties to pay them in case these patents are sustained by the appellate court, or whenever the litigation may be terminated. I have dictated the order in this form, because I did not wish to compel the complainants to file other bills, and prosecute other litigation.

[For other cases involving these patents, see note to Goodyear v. Mullee, Case No. 5,577.]