## CRITCHER v. LINKER.

(Circuit Court, W. D. Wisconsin. April 17, 1909.)

1. PATENTS (§ 214*)—LICENSES—FORFEITURE.

Under a contract of exclusive license by a patentee providing for the payment of royalties, the making of periodical reports, and that in case of default on the part of the licensee the licensor might, on notice, terminate the contract, the failure to make reports at the specified times was not alone ground for such termination, where in several instances it was waived and reports made at longer intervals accepted without objection, and where, by reason of extensive infringements and litigation respecting the patent, it was for a time considered of doubtful value by both parties.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 214.*]

2. PATENTS (§ 218*)—LICENSES—CONSTRUCTION AND OPERATION.

A provision in an exclusive license contract under a patent that, in case the patent should be held not infringed by a certain manufacture by "any court of competent jurisdiction," the royalty should be reduced and limited in all to a certain sum, must be construed as meaning a decision which should finally settle the question of such infringement and a decision of noninfringement by a trial court, which was reversed on appeal, did not have the effect of reducing the royalty.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 218.*]

3. PATENTS (§ 214*)—LICENSES—RIGHT OF FORFEITURE.

By an exclusive license contract under a patent it was provided that, on failure of the licensee to pay royalties to the amount of $3,500, at the end of two years, the licensor might terminate the contract on notice. At the end of the two years, such notice was given; the licensee having then paid royalties of about $3,450. The licensee had also expended a large sum in establishing a manufacturing business under the patent. The licensor was obligated by the contract to protect the validity of the patent and protect the licensee from infringements, but although one suit

---

was finally carried to a successful issue, and a decision of the appellate court sustaining the patent obtained, other infringing articles were in the market which practically evicted the licensee from enjoyment of the patent right. *Held*, that under such facts a court of equity would not decree a cancellation of the contract.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 214.*]

In Equity.

Jones, Addington & Ames, for complainant.

James Thompson, for defendant.

SANBORN, District Judge. The complainant is the patentee in letters patent 781,635, dated February 7, 1905, on combination underwear for women; the patent having been sustained by the Circuit Court of Appeals of this circuit in Leona Garment Co. v. Jenks, 164 Fed. 188, decided July 22, 1908. In Leona Garment Co. v. Jenks, 160 Fed. 693, decided June 5, 1907, the patent was held valid, but very narrowly construed, and held not infringed by the "Ideal" garment there in question. On appeal the decree was reversed, and the patent held valid and infringed by the "Ideal" garment.

Shortly after the issue of the patent, Mrs. Critcher made an exclusive license, operating as an assignment, to the defendant for the full patent term, to make, use, and sell the garments in question. Defendant had been for seven years the foreign buyer of H. W. Gossert Company of Chicago in ladies' furnishings, including laces, silk, linens, velvets, trimmings, embroideries, and ribbons. She made her headquarters in Paris, visiting America as often as necessary. Both parties appeared in court on the hearing. They are able and competent, and both seem to be possessed of practical ability in an unusual degree. It is shown by the record, however, that complainant occasionally mixed Christian Science with matters of business, not invariably producing the best results. Upon the making of the contract defendant established herself in La Crosse, Wis., in the business of making and selling the goods. She now has 28 sewing machines, some of them made specially for her, buttonhole machines, ruffler, double-needle machine, and hemstitcher. She advertised the business quite extensively and at considerable expense. She hired traveling salesmen and a force of needlewomen, and estimates her total investment in the business at $35,000.

At the time the license was made, complainant had a contract with Charles A. Stevens & Co. of Chicago for the sale of $60,000 of the garments in three years, and had commenced the infringement suit already referred to. The contract was assigned with the monopoly. December 22, 1905, the license agreement now sought to be canceled was made. In consideration of $1,600 paid down, $400 to be paid within 10 days, and the promise to pay certain royalties, an exclusive license for the full patent term was given, to make and sell the patented garments. The stipulated royalty was 7 per cent. of the gross sales, payable January 25th, April 25th, July 25th, and October 25th. If, at the end of the second year, the royalty paid should not amount

to $3,500, the licensor might annul the contract, provided she should, at the end of such time, give the licensee written notice of her desire to cancel it; and if the licensee should not, before the end of 90 days from the receipt of notice, pay the licensor, either as advance or accrued royalty, a sum sufficient, with that before paid, to make $3,500, the license should terminate. The $1,600 and $400 payments were to be regarded as advance payments on royalty. If the licensee should fail to pay royalties, at the times specified, then at any time they should be at least 30 days in arrears, the licensor might terminate the license, after serving written notice of such termination on the licensee, provided the amount of royalties in arrears should not be paid within 20 days from receipt of notice.

The licensee agreed to make a written report to the licensor, on each payment day, of the total number of garments made and sold during the preceding three months, and keep accurate account books. The licensor was given the right of examination of such books. If the licensor should cause the contract to be terminated, she should, at the time of such termination, purchase from the licensee at cost all her stock in trade connected with her business in the manufacture and sale of the garments, and should purchase, at a fair market valuation, all her fixtures connected with said business. The licensor agreed, at her own expense, to protect the validity of the patent, and protect the licensee against infringement. In all suits for infringement by the licensor the recovery was to be divided between the parties, in like proportion as if the infringing garments had been sold by the licensee. If the licensor should not bring suit against any infringer, the licensee should have the option to do so within 30 days after written notice of infringement should be served on the licensor, and retain all damages and profits recovered.

The most important provision of the license contract follows:

"Sixteenth. In case said patent should be declared invalid by any court of competent jurisdiction, or should be declared by such court as not infringed by the garment heretofore manufactured by Jenks & Sutherland, for which suit for infringement is now pending against said Jenks & Sutherland, in the United States Circuit Court of the Northern District of Illinois, Northern Division, then the amounts herein specified by said second party to said first party, shall be reduced to one-half of the amounts so specified, and said second party agrees that on all undergarments of the kind described and claimed in said letters patent, which she shall thereafter make and sell, she will pay to said first party one-half of the amounts hereinbefore specified as royalties, until the total sums paid by said second party to said first party (exclusive of said sixteen hundred dollars and said four hundred dollars), shall amount to five thousand dollars ($5,000.00); it being agreed that said second party shall thereafter be relieved from further payments under this contract; and it being understood that the payment of royalties made by said second party to said first party under said contract for foreign patents, shall be applied in making up said total of five thousand dollars."

A further oral agreement was made later between the parties by which defendant was to advance attorney's fees and legal expenses in the Jenks suit, to be credited as advance royalty. This she did until March, 1907, practically up to the time of the hearing of the Jenks suit in the Circuit Court, but refused to advance anything further.

Matters of dispute and mutual complaint soon arose. Defendant

complained that her trade was destroyed by infringements everywhere, which complainant did not stop, as she had agreed to do, and that the attorney's bills in the Jenks suit were outrageously high, and after the decision of the Jenks suit, holding no infringement, that the patent was so narrow as to be practically worthless. Complainant complained that defendant did not furnish quarterly reports, did not pay attorney's bills as agreed, nor answer business letters, and, after the adverse decision, she for a time refused, through her husband, E. P. Critcher, acting as her agent, to put up any more money in the litigation. Later she raised the money and procured the reversal.

Soon after the sale commenced, the traveling salesmen reported infringing garments being sold, and this interfered quite seriously with the disposition of the "Leona" garments, as they were called. One of the infringing garments was made by Madame Tiede-Kugel, of New York, and another, called the "Ideal," by Genevieve Sutherland of Chicago. The last was the one held an infringement by the Court of Appeals. The Tiede-Kugel garment was found to be on sale all over the country. The traveling salesmen reported infringements everywhere they went. Complainant wrote defendant March 24, 1907, that the largest houses in America were manufacturing the garment, "infringing our claim, and it will take money to fight this claim." Later, however, she learned she had been misinformed, and that this statement was not strictly true. The record clearly shows that the infringements encountered by defendant in attempting to market the goods were most discouraging, and amounted nearly, if not quite, to an eviction from the substantial enjoyment of the patent right. Walker on Patents, § 307; White v. Lee (C. C.) 14 Fed. 791.

By the license contract complainant agreed to protect the patent, and protect defendant against infringements; and under the rule stated by Judge Drummond in Goodyear v. Honsinger, 2 Biss. 1, 3 Fish. Pat. Cas. 147, Fed. Cas. No. 5,572, complainant performed her duty under the contract, by prosecuting the Jenks suit and warning infringers. But she could not stop infringement nor prevent the ouster. The chief question on the hearing was whether the notice of annulment given by complainant to defendant January 29, 1908, was effectual and sufficient ground to require a decree of rescission. It was stated in the notice that it was given for defendant's failure to make the quarterly statements, and an alleged failure to pay the stipulated royalty of 7 per cent., and up to the minimum of $3,500 due at the end of the second year.

As to the failure to make quarterly reports: Early in March, 1907, defendant made a written statement showing the amount in dollars and cents of the garments sold from April 1, 1906, to February 28, 1907, by months, and computing the royalty at 7 per cent. This statement is referred to in complainant's letter of March 23, 1907, and was called for by her letter of March 8, 1907. The next statement was from December 22, 1905, to December 1, 1907, not showing monthly sales, but grouping those of several months together. The royalty was computed at 3½ per cent., on the theory that the Jenks garment had been held not an infringement, and that the contract rate was thus

diminished one-half. It does not appear when this statement was made. Neither of these statements was strictly according to the contract, but no objection on that ground was made by complainant. In January, 1908, complainant availed herself of her contract right to examine defendant's books, employing an accountant for that purpose. He reported January 30, 1908. He found that defendant had paid (including interest) $3,450.41, and overpaid her the sum of $588.42, if the royalty was computed at 7 per cent., and $1,683.65, if computed at 3½ per cent. About the date of this report, and on January 29, 1908, complainant served notice in writing purporting to cancel the license contract for the alleged failure to make quarterly reports, and for the alleged failure to pay royalty at 7 per cent., and up to the contract minimum of $3,500 at the end of the second year. Three other statements similar to the one of March, 1907, were made; one February 12, 1908, one March 25, 1908, and the last June 26, 1908. No further payments on the license have been made.

It is claimed by defendant that the reports made substantially complied with the contract, that it would have been useless for her to report for the period up to January, 1908, covered by the reports of the accountant, and that complainant had led her to believe that strict reports would not be required. The correspondence shows that on January 19, 1906, complainant said she was in no hurry for a report, and on July 30, 1906, that if defendant was still without a bookkeeper she would wait. Nothing further appears until after the Circuit Court decision, when complainant, on October 3, 1907, demanded a report. This was met by a reply from defendant stating that the contract was broken, and it was therefore unnecessary to make further statements. On November 22, 1907, there was a further demand for a statement, followed by that of December 1, 1907; and on November 29, 1907, defendant wrote claiming a failure of consideration, and asking a proposition of settlement.

In view of the fact that statements were made in March and December, 1907, not objected to, and that after the reports of the accountant of January, 1908, a report up to January 1, 1908, would have been an idle ceremony, of no possible use to complainant, I conclude that this ground of forfeiture was not sufficient. Jones, etc., Co. v. Crary, 234 Ill. 26, 84 N. E. 651; Densmore v. Tanite Co. (C. C.) 32 Fed. 544.

As to the other ground, the case presents some difficulty. That ground was that defendant had not paid the 7 per cent. royalty, up to the $3,500 minimum. It is necessary to examine the contract to determine whether the royalty was not 3½ per cent., and the minimum $1,750, in which case the defendant had overpaid. If it was $3,500, she was about $50 short. The contract provides that, if "any court of competent jurisdiction" should declare the patent not infringed by the Jenks garment, "then the amounts herein specified * * * shall be reduced to one-half of the amounts so specified, and said second party agrees that on all undergarments * * * which she shall thereafter make and sell she will pay one-half the amounts * * * specified as royalties, until the total sums paid (exclusive of the $1,600 and $400)

shall amount to $5,000, it being agreed that said second party shall thereafter be relieved from further payments under this contract."

The parties must have known that any decree of noninfringement might be appealed and reversed. It must be inferred that they were referring to a decree which should finally settle such infringement. If not, then complainant is put in the position of giving up all her monopoly for $7,000 if it should happen that any Circuit Court erred in holding the patent void, even though the error were speedily corrected; or if the Circuit Court for Illinois should erroneously declare noninfringement by the Jenks garment, and such error be also speedily corrected. It must be supposed that the contracting parties intended to provide for contingencies which might destroy the monopoly, and not those having only a temporary influence. In this view the term "any court of competent jurisdiction" quite clearly was intended to mean one whose decision would be final. Evidently the term was not employed in its technical sense, but the word "competent" was intended to mean competent to finally settle the question. The opposite interpretation leads to highly unjust results, and should be excluded unless the plain intent requires its adoption.

The only remaining question is whether complainant was in a position to renounce or annul the license by the notice of January 29, 1908. Defendant had paid all royalty due up to the time of the notice except about $50; but complainant had been unable to accomplish very much by way of preventing infringement. As has been seen, defendant, after large outlay, was substantially evicted. While it cannot be said that complainant had broken her contract to protect, yet she had at times shown little disposition to carry out that contract. She wrote on October 14, 1906, that she would willingly go on with all infringement suits if she had the money, "but as I have not I fail to protect the patent." Her teacher in the mysteries of Christian Science had deluded her into the belief that, as she had given up the "little garment" to defendant, she must also give up thinking about it, "for two people cannot work on the same problem unless they constantly know each other's thought, and know they are working in perfect harmony. So I give up all the work to you unreservedly and entirely. Mr. McRoberts (her patent attorney) can attend to all the work in the infringement cases." While this foolish declaration should not be taken too strongly against complainant in view of her mental state at the time, and her heroic later efforts to obtain a reversal of the Jenks decree, yet she shows she did not have much regard for her obligation to protect. On June 10, 1907, just after the adverse decision in the Jenks suit, E. P. Critcher wrote defendant he would advance no more money in the litigation. Complainant testified that after this decision she made no special efforts to protect the patent outside the Jenks suit. In that suit, however, her zeal was wonderful. She pawned her jewelry, sold her rugs, tapestries, and furniture, and borrowed all she could to prosecute the appeal. In this way she raised $1,650, and is still in debt to her attorneys. Probably she did all the law required, but at the same time, while she was making these laudable efforts, infringements were multiplying to defendant's great injury. The situation involved delay

and consequent loss to defendant, who was practically ousted from all beneficial use of the monopoly, and at the same time called on to put up more money.

Another fact which may have influenced the situation somewhat was that in the statement of December 1, 1907, the royalty was computed at 3½ per cent., and no objection or protest by complainant. Her accountant also stated the account at both rates. Defendant may well have supposed that complainant acquiesced in her construction that after the adverse decision the royalty was cut in two. It is true that the notice of renunciation requires payment at 7 per cent., up to $3,500, so that this theory of acquiescence should not be given any great weight.

While I find that complainant did all the law required to prevent infringement, yet because she did not succeed, because defendant was practically evicted, because of the relatively small sum due from her when the notice was served, and in view also of the large outlay of defendant, much of which would be lost even if complainant should be required to purchase the stock in trade and fixtures, it is evident that it would be highly inequitable to give effect to the notice of renunciation. By the tenth clause of the contract defendant must pay $5,000 for the year 1908, and a like sum every succeeding year, or the contract may be canceled. Were it not for the fact that complainant has been offered a large sum for a half interest in the patent, it is probable she would not seek to enforce cancellation. At all events, it would be highly unjust to decree it for the reasons stated.

A decree will be entered dismissing the bill without costs for or against either party, but the defendant directed to pay such fees of the clerk of this court as may be unpaid.